IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

DEBRA WALKER                                                                                          PLAINTIFF

v.                                                                      CIVIL ACTION NO.4:11CV044-SA-JMV

MISSISSIPPI DELTA COMMISSION
ON MENTAL HEALTH ILLNESS AND
MENTAL RETARDATION, A/K/A DELTA
COMMUNITY MENTAL HEALTH SERVICES, et al.                                          DEFENDANTS

**MEMORANDUM OPINION**

Presently before the Court is Defendants' Motion for Summary Judgment [38]. Because Plaintiff has failed to raise a genuine dispute of material fact regarding her Title VII, 42 U.S.C. § 1983, and state law based intentional infliction of emotional distress claims, the Court GRANTS that motion.

**FACTUAL BACKGROUND**

Plaintiff Debra Walker, African-American, began her employment with Delta Community Mental Health Services (DCMHS) as a secretary in 2004. In 2006, she was named the purchasing clerk. At the time of both her hiring and her transfer to the position of purchasing clerk, Gil MacVaugh was the Executive Director of DCMHS. In her role as purchasing clerk, Walker was primarily responsible for overseeing the issuance and recording of purchase orders. She frequently interacted with employees seeking authorization for various purchases and was responsible for passing them on to the Executive Director for ultimate approval. One such employee who frequently procured purchase orders was Tony Kozielski, Caucasian, who served as the maintenance manager.

It is undisputed that Kozielski and Walker did not get along well. Shortly after taking over as the purchasing clerk in 2006, Walker accused Kozielski of being involved in an embezzling conspiracy and informed him that she had proof of such involvement. She informed her superiors and an investigation was at least initiated by the Attorney General's office.

Approximately three years later, Richard Duggin, Caucasian, assumed the position of Executive Director following the death of MacVaugh. On December 10, 2009, the tension between Walker and Kozielski resulted in an altercation that provoked the filing of a formal workplace complaint by Walker. In that complaint, Walker alleged that "Tony stopped talking to [a co-employee] and told me to get my damn ass out of there." Walker later, however, asserted that Kozielski actually stated that he would "knock her black ass to the floor." She states that although she did not initially record his comments as such, there are witnesses who also heard him. In her deposition, Walker describes the encounter thusly:

> Then I heard him screaming and hollering, "I'll knock your - - to the floor." So I turned around, thinking he was talking to Dottie, getting ready to laugh, and he's pointing at me…So I say, "knock - - to the floor? If you don't get out of my face I'll knock your - - to the floor." I just turned around and walked out. I said, "I'll charge you with sexual harassment."[1]

After the event, Walker submitted a written complaint to Duggin, who followed up by asking finance director Nonie Davis, African-American, about Kozielski's reputation and then directly questioning Kozielski about the incident. Davis informed Duggin that although Kozielski was "gruff," he did not have a reputation for making racist remarks. Kozielski reported that he had told Walker "he wasn't talking to her damn ass" after Walker had jumped into a conversation he had been having. Duggin issued a verbal warning to Kozielski and directed him to apologize to Walker.

---

[1] The Court has taken no liberties by editing the testimony of Plaintiff. Her testimony is as it appears in the deposition.

A little more than a month later, Walker approached Duggin and informed him that Kozielski was not following the appropriate protocol when submitting his requests for purchase orders. She informed him that the two could not get along and, in response, Duggin created a work-around plan whereby Duggin, himself, would issue ten purchase orders monthly to Kozielski. Duggin believed that by cutting down the interaction between the two parties, he could alleviate the tension. Several months later, however, Walker again approached Duggin about Kozielski, informing him that Kozielski had not been turning in the fulfilled purchase orders in a timely manner, and that she did not want to be held accountable for his mistakes.

On October 21, 2010 Duggin was out of the office on medical leave and thus unable to fulfill Kozielski's requests for purchase orders. Kozielski therefore approached Walker for two purchase orders. Although she filled the first request, she informed him that she could not issue the second due to a new policy. According to Walker, he responded by saying, "that's why I can't stand your black ass, crazy ass, mother-fucking bitch—your black ass, crazy ass, fucking bitch. That's why I can't stand your black ass." Walker then went to Davis' office, but had to wait outside until Davis became available. While in the hallway, Kozielski approached her and the altercation between the two continued. According to Walker, "he started, you know, hollering something, 'you all this and that.'" Davis pulled the two employees into her office in an attempt to defuse the situation.

Davis created a written report following the incident, stating "Tony told Debra that he hopes to catch her at Kroger or the bank doing personal business when she's on company time and waiting to see what happen." During her deposition, however, Walker contested the accuracy of that account.

> A. "[T]hat's when he went on talking about he seeing me at Kroger, and this and that and- -

> Q. Hold on. I want you to be specific. "See me at Kroger, this and that- -"
>
> A. You know, that I be running errands on mental health time. And he said- - Nonie was saying something to him. And he told Nonie, he said, "I didn't have any more purchase requisitions." And I said to Nonie, "Well, how was I supposed to know that?"…
>
> Q. Okay. So he said something about seeing you out on mental health time at Kroger, or something, then he was going to report you, right?
>
> A. Right. And he said, "You think that's something. You let me catch you at Kroger parking lot or anybody's parking lot and I got something for you."… So I said, "You mean to tell me now you're going to threaten me in front of our boss?" And he repeated himself. "Like I said, let me catch you at Kroger's parking lot or anybody's parking lot, and I got something for you."…
>
> Q. On company time, and then he's going to report you.
>
> A. No that's not what he said.

During the deposition, Ms. Walker underlined the portion of Ms. Davis's statement which she disagreed with and testified to what actually transpired. She stated:

> He said, "I seen you leave Kroger, go to the bank on company's time" because he's sitting out there in his car watching where I'm going instead of going back on to the center, what he's doing, because nine times out of ten when I went to the store, I went for clients. I was doing stuff- - I was doing stuff for the mental health you know. That's what I was doing it for, clients at the mental health.
>
> And so then he got so flustrated, that's when he said, "But let me catch you in Kroger parking lot or anybody's parking lot, and I got something for you." Now that's what he said, and that's how he said it. He didn't say anything about personal business and that, in that likeness. No that's not what he said.

Following this altercation, Walker went to the local police station where she filed an incident report based on the allegedly threatening behavior displayed by Kozielski. Walker, however, did not sign the report because she wanted to wait until Duggin returned from leave. Walker waited "three working business days" following Duggin's return to see if he was going to schedule a conference to meet with her regarding the latest incident with Kozielski. Duggin

4

contacted the DCMHS legal counsel, Nick Crawford, to attempt to set up a meeting regarding the incident. Crawford's brother was seriously ill, however, and Crawford stated that he could not meet until the next week. Duggin, therefore, did not meet with Walker within the three business days and Walker formally filed the charges. Kozielski was thereafter arrested. Duggin posted bond for Kozielski and told him not to have any further contact with Walker.

On April 11, 2011, however, there was another dispute between the two. Walker attests that Kozielski came through the office with several inmates who told her good morning. Kozielski, however, allegedly told the inmates, "Y'all ain't got to say anything to that black ass, crazy ass woman." Walker attempted to inform both Davis and the human resources coordinator of this event, but they were, according to Plaintiff, uninterested. Walker was unable to recall who the inmates were. When asked about who else might have witnessed the incident, she stated that there were witnesses, but "when you're embarrassed and hurt, you don't see other folks. It was people there. But who they were, I don't know. But yes, it was people there." Later that same day, Walker claimed she could not take any more abuse and left on medical leave. She thereafter submitted a medical opinion stating that she suffered from "acute situational depression secondary to verbal abuse." She did not return to the employ of DCMHS after leaving on April 11, 2011.

Following her leave of absence from DCMHS, Walker claims that she was approached by co-employee Wade Shepard who informed her that he had proof of Kozielski's derogatory statements. According to Walker, Shepard played a recording in which Kozielski allegedly stated, "What we ought to do is gag her, tie her up, and threw her over in the Mississippi River." Shepard did not, however, inform Walker of when these tapes were produced.

Plaintiff thereafter filed in state court a litany of claims arising under Title VII, 42 U.S.C. § 1983, 42 U.S.C. § 1981, the Mississippi Whistleblower Law, and Mississippi tort law. The case was removed to this Court based on the presence of a federal question and this Court subsequently granted a motion to dismiss as to the whistleblower and intentional infliction of emotional distress claims against DCMHS and the Title VII claims against Duggin and Kozielski. DCMHS has since filed a motion for summary judgment, arguing that Walker has produced insufficient evidence to support her Title VII claim against DCMHS and her intentional infliction of emotional distress and § 1983 claims against Duggin and Kozielski. Walker has failed to respond to the motion, but the Court has reviewed the record and construes it in her favor.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In

reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

## DISCUSSION

*Hostile Work Environment*

As a note of introduction, the Court finds it necessary to "recite the profane language that allegedly permeated this workplace exactly as it was spoken in order to present and properly examine the social context in which it arose." Reeves v. C.H. Robinson Worldwide, 594 F.3d 798, 803 (11th Cir. 2010). Its full and unfiltered consideration is necessary to evaluate the Plaintiff's claims at issue. Id. In order to survive a motion for summary judgment on a hostile work environment claim, the Plaintiff must establish that (1) she is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) that Defendants knew or should have known about the harassment and failed to take prompt action. EEOC v. W C & M Enter., Inc., 496 F.3d 393, 399 (5th Cir. 2007); Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 347 (5th Cir.2007). In order to determine whether the harassment affected a term, condition, or privilege of employment, the court must evaluate "the

7

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating ... and whether it unreasonably interferes with an employee's work performance." Walker v. Thompson, 214 F.3d 615, 625 (5th Cir.2000) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

Indeed, "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive" in order to establish a Title VII violation, DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.1995), but "simple teasing, offhand comments, and isolated incidents, (unless extremely serious) will not amount to discriminatory charges" that will survive a motion for summary judgment. Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 328 (5th Cir. 2004). To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

Although Plaintiff's sworn statements that discriminatory conduct occurred may in some circumstances be sufficient to create a genuine dispute of material fact, the allegations must be definite and particularized. Barkley v. Singing River Electr. Power Assoc., 433 F. App'x 254, 258 (5th Cir. 2011) ("[Plaintiff] seemingly believes that his affidavit and deposition testimony should be sufficient. For some hostile work environment claims, a plaintiff's sworn testimony may be enough to raise a fact issue. Here, however, the allegations are ambiguous and generalized."). In light of this, the court has consistently upheld the dismissal of cases when the plaintiff's testimony is replete with generalized grievances and inconsistencies. See id.; Carrera v. Commercial Coating Services Int'l, Ltd., 422 F. App'x 334, 338 (5th Cir. 2011); Ramsey v. Henderson, 286 F. 3d 264, 269 (5th Cir. 2002).

In Carrera, for instance, the court considered the claims of several plaintiffs who proceeded in a consolidated action. One group of plaintiffs proffered a few concrete instances of harassment, but primarily relied on their generalized assertions that non-black employees were "harassed and degraded and humiliated on a constant basis" and that they were "consistently harassing and badgering with racial slurs and vulgarity" to support their claim. 422 F. App'x at 339. The court found that the allegations of "constant" abuse were insufficient without additional proof and that the concrete examples were too sparse to make a showing under the pervasive requirement. Id. Further, a plaintiff's unsupported allegation that a co-employee had attempted to run him over while on a field job was also insufficient. Id.

On the other hand, the court found another plaintiff's allegations capable of supporting a claim when the plaintiff supported both the seriousness and pervasive prongs by testifying that a co-employee "constantly called [plaintiff] either stupid Mexican or f**cking wetback" and additionally produced evidence that he had been physically threatened by his co-employee banging his fist on his car and that a manager had intentionally slammed a hammer down on a nearby table, causing physical injury. Id. Thus, if a plaintiff relies on primarily on the seriousness prong, as opposed to the pervasive considerations as well, more will be demanded in terms of the severity of the conduct. Dediol v. Best Chevrolet, Inc., 655 F. 3d 435, 442 (5th Cir. 2011) (citing WC & M Enters., 496 F. 3d at 400; see also Wilson v. The Laitram Corp., 131 F. Supp. 2d 826, 835 (E.D. La. 2001) (noting that a sole incident in which the co-employee called the plaintiff a "black bitch", "nigger", and threatened to "kick her ass" would not meet such a requirement).

In the case at hand, the Court finds the facts presented by Plaintiff fail to create a genuine dispute of material fact regarding her claim for a hostile work environment. In doing so, the

Court finds competent evidence regarding only a handful of incidents. The Court thus turns to these specific allegations and examines them in detail. Accepting Walker's allegations as true, on December 9, 2009, Kozielski stated that he would "knock her black ass to the floor." Then, on October 21, 2010, Kozielski described Walker as a "black ass, crazy ass, fucking bitch" or a "black ass, crazy ass, motherfucking bitch." Further, granting the most favorable construction to Walker's testimony, he immediately thereafter stated, "But let me catch you in Kroger parking lot or anybody's parking lot, and I got something for you." Finally, on April 11, 2010, Kozieslki also allegedly told a group of inmates that they need not say anything to "that black ass, crazy ass woman." These incidents, even when viewed in a light most favorable to Walker, are simply insufficient to constitute harassment that is severe enough or pervasive enough to alter a condition of Walker's employment. As stated in Hockman, absent an extraordinarily serious threat, isolated incidents will not give rise to a hostile environment claim. Hockman, 407 F. 3d at 328. Similar to the situation in Carrera, Walker proposes only a few specific instances where she claims to have been discriminated against based on her race. The court there found that the identification of a handful of isolated incidences, without more, was insufficient to amount to a discriminatory change in the terms or conditions of employment. 422 F. App'x 334, 338.

Moreover, what Walker's few specific allegations lack in numerosity, they fail to make up in terms of severity. As indicated by the court, particularly serious incidents may be sufficient to preclude summary judgment even if the discriminatory conduct does not appear to have been frequent. Harris, 510 U.S. at 21, 114 S. Ct. 367 (noting that Title VII is violated when harassment is sufficiently severe *or* pervasive) (emphasis added). However, the "the required level of severity or seriousness varies inversely with the pervasiveness or frequency of the

conduct." Dediol, 655 F. 3d at 442. Because Walker has produced competent evidence of only a handful of incidences, more is required in terms of the severity of the alleged harassment.

There are a handful of specific allegations at hand: the threat to "throw [Walker's] black ass to the ground" and the characterization of her as a "black ass, crazy ass, fucking bitch" or a "black ass, crazy ass, motherfucking bitch" accompanied with the alleged parking lot threat. The Court declines to find these threats sufficiently serious to survive the summary judgment stage. Courts have consistently downplayed such threats when unaccompanied by an aggravating factor. See Wilson, 131 F. Supp. 2d at 835 (commenting that had the threat to "kick her ass" been an isolated event, the claim would not have survived past summary judgment); see also Lamar Co., LLC v. NLRB, 127 F. App'x 144, 149 (5th Cir. 2005) (discounting the gravity of a threat to kick a co-worker's ass in the organized labor context). As for the alleged parking lot threat, even accepting Walker's construction, the statement is simply far too vague and ambiguous to constitute an extremely serious incident of harassment. The Court therefore finds that none of the statements at issue were sufficiently severe or pervasive enough to change the terms or conditions of Walker's employment as required by Title. VII.

Although Plaintiff has failed to respond to Defendants' motion for summary judgment, the Court presumes that had she done so, she likely would have relied heavily on some of her ambiguous contentions during her deposition that harassment was "continuous" throughout her employment. The Court will therefore articulate why such reliance would be misplaced.

In Barkley, the court refused to consider generic assertions of "continual" harassment. There, the plaintiff made assertions such as "[t]hey used a lot of racial slurs, nigger this, blah, blah, blah . . .He just was talking, just guys in the group just talking…about the first black guy they had in the company…black people coming in and taking their jobs." 433 F. App'x 255.

11

The plaintiff had only made two formal reports of discriminatory remarks, but asserted that he had informed his friend and direct supervisor about the slurs "throughout [his] whole years of really being there." Id. The court, however, found the vague and ambiguous assertions, which lacked specific dates and were often contradicted by other portions of the plaintiff's testimony, to be insufficient to defeat summary judgment. Id. at 258. Similarly, the court upheld dismissal in Ramsey v. Henderson, where the plaintiff made vague assertions of racial animus displayed over a thirteen year period and claimed generally that she suffered "ongoing racial harassment from black females." 286 F.3d at 269.

Here, Walker at one point in her testimony stated, "[f]rom the day we didn't go to court until the day I left, Tony had something ugly every day to say about me. Every day. Somebody call my name, he had something to say. Every day." She asserted that such conduct would include Kozielski saying things such as, "Debra, that crazy black ass woman." When asked who might be able to corroborate this, however, she refused to provide any witnesses. The following exchange is informative.

> Q. Who would he be talking to?
>
> A. Anybody in there, visitors, clients, patients, anybody. He did it to them.
>
> Q. Ms. Walker, I want you to give me some names so I can go ask those people if what you're saying is accurate, okay? So tell me names of people that you can tell me will corroborate what you're saying.
>
> A. I can't think of any of them now. But you can ask any of them that work there. Ask the people that work there…
>
> Q. Can you just give me one - -
>
> A. I don't have no names. I don't have no names.

Further, even if the absence of corroboration and detail by itself is not enough to foreclose Walker's reliance on it for purposes of avoiding summary judgment, Walker's

12

characterization of that purported continual harassment significantly reduces any persuasiveness it might offer. Walker was continually asked throughout the deposition to describe that conduct which she perceived to be racially discriminatory. That line of questioning is particularly enlightening.

> Q. I guess what I want to try to find out is which [disputes] are you saying were - - had racial animus behind it, had something to do with race.
>
> A. The one that happened in December of '09 and the one that happened in October the 21st of 2010…
>
> Q. And the discrimination took place - - the earliest it began was December 10, 2009, right?
>
> A. Right.
>
> Q. You agree with that, don't you?
>
> A. That's what I said …
>
> Q. Okay. What derogatory racial names did Tony use to you and when?
>
> A. On those two days…
>
> Q. We, I want to, again, make sure I understand because I think you and I had agreed that between December 10, 2009 and October 21, 2010 there was no conduct by Mr. Kozielski which you deemed to be racially discriminatory. So this [allegation of every day harassment] all occurred before?
>
> A. Well, now, you asked racially. Now, every time he did something it wasn't racially. Sometimes just be hostile stuff. That's why Mr. Duggin and Nonie would try to keep him with those ten blank purchase requisitions, so it would be no contact between - - when it wasn't any contact between Tony and I, there was no problems.

As an initial matter, these allegations suffer the same vague and ambiguous defect as the former. They are not at all particularized and must be cobbled together as in <u>Barkley</u>. Similar to the plaintiff's testimony there, she often confuses or does not provide dates and seems to frequently contradict her own testimony, rendering her narrative far less than cogent. Further,

however, Walker's own statement that she did not perceive the more frequent occurrences as being racially discriminatory prevents her from being able to meet her burden showing that the racial harassment at issue was severe and pervasive.

Finally, because of the potential gravity of Walker's statement that she heard a recording in which Kozielski allegedly stated, "What we ought to do is gag her, tie her up, and threw her over in the Mississippi River," the Court also articulates why even this would have been insufficient to ground Walker's claim without additional evidence. It is uncontested that at the time of hearing this, Walker had been terminated by DCMHS and was no longer an employee. Although Walker claimed she did not know when the recordings had been made, she is unable to create a genuine dispute of material fact through such vague innuendo. In order to survive a motion for summary judgment, the plaintiff must provide more than conclusory allegations. TIG Ins. Co., 276 F.3d at 759. Post-employment acts simply cannot provide the necessary support for a claim based on the environment the employee was subjected to in the course of her employment. Buckhanon v. Huff & Assoc. Constr. Co., Inc., 506 F. Supp. 2d 958, 968 (M.D. Ala. 2007) ("a hostile work environment claim requires that the employee *be subjected* to the environment."). Additionally, other than her sworn testimony that she heard the tape, Walker has produced no additional evidence of this event. Similar uncorroborated allegations of alleged harassment have been insufficient to avoid summary judgment. Carrera, 422 F. App'x at 338 (finding allegation that co-employee "once tried to run him over with his car while working on a field job" was insufficient because it was unsubstantiated.).

Finally, in regard to whether the harassment was sufficiently pervasive to affect her performance, the uncontroverted facts before the court likely lean in favor of Walker. Walker procured a medical opinion stating that she was unfit to work due to "acute situational depression

secondary to verbal abuse." Walker has additionally testified that the verbal abuse was the product of Kozielski's statements at work. She, herself, however, testified that only two to three of those incidences were based on race. The Court finds that the whole of the factors articulated in Harris do not allow an inference of liability under Title VII. 510 U.S. at 23, 114 S. Ct. 367.

Thus, even when viewing the facts in a light most favorable to Walker, she is unable to produce sufficient evidence to support her claim for hostile work environment. Walker's uncorroborated allegations regarding the ongoing nature of the harassment are too vague and amorphous, and the specific events she cites are not of the extremely serious variety sufficient to constitute a change in the terms or conditions of her employment. Because Walker has failed to raise a genuine dispute of material fact in this regard, the Court need not consider the employer's knowledge of such conduct. Defendants' motion for summary judgment is due to be granted.

*Section 1983 Claims*

Plaintiff additionally asserts a § 1983 cause of action against Kozielski and Duggin in both their official and individual capacities. In her complaint, Walker avers that Kozielski violated the "clearly defined rights of Plaintiff to be free from a hostile work environment, racial slurs in the workplace, threats of assault and intimidation." As to Duggin, Walker asserts that Duggin's inaction following the reports of harassment constitute "deliberate indifference to the rights of Plaintiff in violation of 42 U.S.C. § 1983." As set forth in the hostile work environment discussion, Walker has failed to put forth a prima facie case in support of her alleged Title VII violation. Additionally, Walker has failed to proffer any additional support for her claim. In the course of its own review, the court has been unable to find anything more than conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments supporting her § 1983 claim. Such arguments fail to serve as an adequate substitute for specific facts showing a

genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075. The Court therefore grants the Motion for Summary Judgment as to Walker's § 1983 claims.

*Intentional Infliction of Emotional Distress*

Mississippi courts recognize intentional infliction of emotional distress claims when the defendant's conduct evokes outrage or revulsion. Jones v. Fluor Daniel Serv. Corp., 959 So.2d 1044, 1044 (Miss. 2007). Generally, meeting such a test is a "tall order in Mississippi." Speed v. Scott, 787 So. 2d 626, 630 (Miss. 2001) (quoting Pegues Emerson Elec. Co., 913 F. Supp. 976, 982 (N.D. Miss. 1996)). "Liability has only been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." White v. Walker, 950 F. 2d 972, 978 (5th Cir. 1991) (quoting Restatement (Second) of Torts § 46). This Court has before held that "[r]ecognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." Pegues, 913 F. Supp. at 983 (citing White v. Monsanto Co., 585 So. 2d 1205, 1210 (La. 1991)).

As previously established, Walker has produced competent evidence of two to three incidents of harassment. On one hand, she has provided evidence that Kozielski told her he would "knock [her] black ass to the ground" and on another occasion made a veiled threat while referring to her as a "black ass, crazy ass, fucking bitch." This Court previously addressed a similar factual situation in Lawson v. Heidelberg Eastern. 872 F. Supp. 335, 335 (N.D. Miss. 1995), aff'd, 70 F. 3d 1269 (5th Cir. 1995). There, the plaintiff brought suit for intentional infliction of emotional distress based on the conduct of a co-employee during a work-place

16

altercation. Id. at 336. The plaintiff testified that his co-employee exploded during a disagreement, referring to him as a "sorry son-of-bitch" three times. Id. Moreover, according to the plaintiff, the co-employee stated that he would "blow [his] f-ing head off" and "stomp [his] ass in the pavement." Id. The Court found that although the conduct described was certainly improper, it failed as a matter of law to support a claim for intentional infliction of emotional distress. In doing so, the Court, by analogy, looked to a Louisiana case that noted "[p]ersons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Id. at 338 (citing White, 585 So. 2d at 1209).

On the other hand, the Mississippi Supreme Court has more recently addressed the viability of an intentional infliction of emotional distress claim when the verbal harassment from which the claim arose also contained a racial element. Jones v. Fluor Daniel Serv. Corp., 959 So. 2d 1044, 1044 (Miss. 2007). There, a group of employees brought suit based on the fact that the employees' supervisor stated that "the monkeys could go to the line or go to the rope," the supervisor consistently segregated Mexican and African-American workers, and the supervisor was alleged to have assigned more arduous labor to the African-American employees. Id. at 1048. The Court held it was reasonable for a jury to find such conduct outrageous and revolting, relying on the fact that the racial slur was accompanied by a reference to lynching and that the statement carried additional weight because it was spoken from a position of authority. Id. at 1049; see also Luckett v. Home Depot, USA, Inc., 2007 WL 4292577, * 10 (S.D. Miss. Dec. 5, 2007) (finding sufficient evidence to avoid summary judgment when plaintiff was asked by supervisor, "Why didn't you get it done, you dumb nigger?," supervisor then made a comment

about dragging plaintiff behind a pickup truck, and supervisor then stated, "that's what they do to niggers down here in the south.").

Applying such reasoning to the case at hand, the Court finds the workplace incidences involving Walker are not so extreme as to be regarded as "atrocious and utterly intolerable in a civilized community." First of all, the comments at issue here, although certainly degrading and unacceptable, are not nearly as inflammatory as those uttered in Jones and Luckett. Additionally, Kozielski was not in a position of authority over Walker. After all, it was he who had to receive authorization from her before proceeding with a purchase order. Finally, as for the alleged tape recording, its significance is vastly reduced due to the fact that this alleged statement was not made to Walker. See Smith v. Home Depot USA, Inc., 2007 WL 4292572, * 5 (S.D. Miss. Dec. 5, 2007) (finding second-hand harassment to carry less evidentiary weight in the hostile work environment context). Walker has made no showing that, even if Kozielski in fact made the statement, he intended for Walker to hear it. In light of the Court's high standards for a finding of intentional infliction of emotional distress, the Court finds summary judgment due to be granted as to Walker's intentional infliction of emotional distress claims as well.

*Section 1981 Claims*

Defendants have failed to specifically attack Walker's § 1981 claims, and the Court would therefore typically be dissuaded from evaluating the merits of such claims. However, given the Court's present disposition of Plaintiff's other claims, the Court is dubious that the § 1981 claims are sufficient to survive the summary judgment stage. The Plaintiff is therefore granted fourteen (14) days following the entry of this order to provide reasoning as to why the Court should not *sua sponte* grant summary judgment in favor of the Defendants as to the Plaintiff's § 1981 claims.

18

## **CONCLUSION**

For the reasons stated above, the Court grants Defendants' Motion for Summary Judgment [38] as to Plaintiff's Title VII, § 1983, and intentional infliction of emotional distress claims. Plaintiff's § 1981 claims, however, remain. Plaintiff is afforded fourteen (14) days to provide briefing in support of those § 1981 claims.

So ORDERED on this, the 25th day of October, 2012.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**